UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMIA ALFORD

    Plaintiff,

v.

MUSKEGON FEDERAL CREDIT
UNION, and TONI WINSKAS, individually
and personally

    Defendants.

Case No.

Hon.

# COMPLAINT AND JURY DEMAND

Plaintiff, Demia "Mia" Alford, by and through her attorneys, Pinsky, Smith PC, hereby represents:

## A.  NATURE OF PROCEEDINGS

1.      This is an action under the PUMP Act 29 USC §218d and Michigan's Elliot Larsen Civil Rights Act for Discrimination based on race and retaliation, to prosecute claims unlawful employment practices under the PUMP Act on the basis of race, and to provide appropriate relief to Plaintiff.

## B.  JURISDICTION

2.      Jurisdiction of this action is based on federal question under the FLSA. The employment practices alleged to be unlawful were and may now continue being

1

committed with the jurisdiction of the United States District Court for the Western District of Michigan.

3. Venue and supplemental jurisdiction is proper within this judicial district under 28 U.S.C.§1391(b), and §1331 and §1367.

## C. PARTIES

4. Plaintiff is a resident of Muskegon County, Michigan and the Western District of Michigan.

5. At all relevant times, Defendant Muskegon Federal Credit Union (MFCR), was a corporation doing business in the State of Michigan and City and County of Muskegon.

6. Toni Winskas, was the President and CEO of Defendant Credit Union at all relevant times, was the ultimate decision maker for the company, and is an employer under the Elliot Larsen Civil Rights Act. At all relevant times, Defendant MFCR has been, and has continued to be, an employer under the Acts herein. Upon information and belief, MFCR has 14-16 regular employees.

## D. RELEVANT FACTS

7. Plaintiff incorporates Paragraphs 1 - 6 as though set forth herein.

8. Plaintiff, African-American, became employed by Defendant in February of 2024 as a teller.

9. Plaintiff worked 40 hours a week at the Holton road branch (and briefly on Laketon location (3weeks)) of MFCR including the 1700 Houghton Rd in

Muskegon. Samara Hutchins was the manager to whom she reported and the President of the bank, who had ultimate authority as to decisions, is and was Defendant Toni Winskas.

10. Plaintiff was the only African-American at her employer. She was not treated well by some of her co-workers at the outset, but those issues resolved. In Spring of 2024, Plaintiff became aware she was newly pregnant.

11. In June and July of 2024, a male co-worker, Dave Golden, began to make mocking comments toward Plaintiff regarding her race. Over the course of several weeks he asked racially provocative questions about her hair. He told her that he was going to start calling her "Shenequa," which he did, even though she expressed her dismay to him about it, and hung up on him when he called her the name over the phone. He also made references such as:

- When she wore a new hairstyle to work, he stated, "Did your hair grow overnight, or is that a wig?" Plaintiff indicated to him that the comment was inappropriate.

- When she was at her station, Mr. Golden got close to her and leaned in toward her. She turned around and looked at him, and he said, "I'm just checking out your extensions." She told Golden that he was making her uncomfortable.

- Again, while working in the same location in the same area, Mr. Golden was staring at her hair while she was working. He blurted out, "Wow! They are making horsehair look more realistic!" Plaintiff responded that they had already talked about this and that his comments made her uncomfortable and should stop it. Golden responded, "Touchy subject, huh?"

12. Plaintiff complained after each of the above comments to management personnel including Sam Hutchins, Nikki Chapin and Defendant Winskas. At first, Defendant Winskas stated, "are you *sure* you want to report this? If you want to report this, I have to write it up." Plaintiff stated she did want to report the

behavior. The first time Plaintiff complained, Ms. Chapin stated, "That's just Dave. He was born at a different time," (as if that fact excused racial animus and harassment in 2024 in Muskegon, Michigan). Other times when she complained both Chapin and Hutchins responded, "He was just joking."

13.    After the harassing comments and behavior continued after complaining several times, Plaintiff again went to management about the racial harassment and gave verbatim examples of many of the discriminatory comments Golden made. This time she did so in writing.

14.    Ms. Winskas reported back to Plaintiff that Winskas was "shocked," but Golden admitted that he did indeed say such things. Ms. Winskas then told Ms. Alford, "he won't do it again." Plaintiff stated, "After four complaints to you, I would expect that he would receive more than a talking to." Winskas responded, "Well nobody's perfect Mia."

15.    These insensitive and invasive comments and questions from Mr. Golden made Plaintiff embarrassed and self-conscious. Plaintiff was reluctant to wear her new wigs at work as she didn't want any more mocking or nasty comments from Mr. Golden. She had already been nervous about having to inform management that she was pregnant, and this harassment that was allowed to continue for months made the workplace even more of a difficult, hostile place to work.

16.    A co-worker who learned privately that Plaintiff was pregnant informed Defendant Winskas. Plaintiff did not want to share it with management

yet as she was having complications in her first tri-mester and feared she would lose the baby. Winskas brought her into her office and told Plaintiff what she heard. Winskas asked why she hadn't told her, and Plaintiff said she was not ready to do so. Winskas told Plaintiff that everyone at work would need to be told that Plaintiff was pregnant. Plaintiff responded that she did not like that idea and Winskas responded that there was no choice, and she "had" to email everyone and tell them.

17.    She was given trouble by management for having to go to such appointments during her workday. When she informed management that she had a medical checkup or appointment for her pregnancy, she was told that she shouldn't be missing time as it was "disruptive to other staff." They began scrutinizing her hours and scolding her even if she was just minutes late.

18.    Plaintiff was in a car accident with her toddler, which took her out of work a day and a half, which was another time she was chastised for missing time. anytime. Anytime Plaintiff had a medical appointment she was warned about taking too much time and was informed how much PTO she had left.

19.    Plaintiff went off of work on leave to give birth on November 15, 2024.

20.    When she returned to work after six weeks off at the end of December, she asked Hutchins if there was somewhere she could pump as she was nursing her baby. Samara Hutchins said she spoke with the president about me pumping and that Winskas said they might try, "even if technically didn't have to" allow her to do so because of a loophole in the law.

21. Plaintiff wanted to do her pumping during her lunch break as it was helpful with milk production to eat while she pumped, and also because Winskas asked her to do so. Plaintiff suggested the break room and was told no because "someone might need something in there." The first time she pumped Hutchins allowed her to go in a storage area. However, Hutchins came to Plaintiff and told her that Winskas said that Plaintiff could not pump there and stated the only place left was the bathroom.

22. At the Holton Rd location where Plaintiff worked at the time, there were actually three separate spaces *other than the bathroom* that Plaintiff could have used to pump with minimal or no alteration: the storage room, the lunchroom and an office up front that was unassigned and often empty.

23. Plaintiff, however, was relegated to the bathroom, it was not satisfactory or reasonable place to pump. Even if she could lock the door, there were people that needed to use the bathroom, and they would urinate and defecate moments before Plaintiff was pumping and eating her lunch and when Plaintiff had breaks to express (which was only occasional).

24. Plaintiff complained more than once to Hutchins about having to pump in the bathroom and notified her it was not an appropriate place for her to express milk during lunch. She asked if she could go back to the storage room or one of the other rooms. Hutchins responded that Winskas said that she couldn't use it because other people "might need to get in there."

25.    One time when Plaintiff complained, Hutchins brought Plaintiff to Winskas' office to speak to her directly. Winskas stated again to her that the bathroom was the only place for Plaintiff to pump at work. Defendant Winskas stated that she would order a table for the bathroom so Plaintiff could have a place to set her things while she ate. No table had arrived for this purpose while Plaintiff was employed.

26.    Soon after, Plaintiff was late a minute, or a matter of minutes, for a scheduled shift and was terminated from her job on January 23, 2025. Upon information and belief, other workers that had not complained about racial discrimination or about the pumping at work did not have their arrival times nor their PTO scrutinized like Plaintiff's was by management.

### E. COUNT I

### Violations Of The Pump Act

27.    Plaintiff incorporates paragraphs 1 through 26 as if set forth herein.

28.    The Pump Act 29 USC 218d(a)(2) states that an employer "shall provide – a place *other than a bathroom*, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."

29.    For employers that have under 50 employees, they may be relieved of going to great lengths to accommodate the employee, but only if undue hardship is shown.

30.    Plaintiff provided notification that she needed a place to pump her breast milk at least once per shift, and preferably two or three times per shift.

7

31.    There were several other options at the location that Plaintiff could have used to express her breastmilk, but Plaintiff was forced to use the bathroom, in violation of the Pump Act.

32.    Plaintiff verbally opposed being relegated to the bathroom to pump her breastmilk several times to management. Further, the employer indicated that they had no intention of providing any other space other than the bathroom for this purpose.

33.    There was no undue hardship for the Employer to allow Plaintiff to use one of the other rooms at the location to pump once or twice per day.

34.    In addition to the Pump Act violation of forcing Plaintiff to use the bathroom to express her breast milk, she was retaliated against by being terminated after she had complained about the conditions several time, also in violation of said Act.

## F. COUNT II

### Race Discrimination and Retaliation Under Michigan Elliot Larsen Civil Rights Act

35.    Plaintiff incorporates paragraphs 1 through 34 as though set forth herein.

36.    Defendants by their conduct as aforesaid, violated Michigan Elliot Larson Civil Rights Act, specifically MCLA 37.2013 and 37.2202, in that they discriminated against Plaintiff, allowing racial harassment by one of their long-time employees, because of Plaintiffs race.

37.    Such discrimination was willful in that Plaintiff was harassed many times by Dave Golden, managers claimed such hateful behavior was a joke, management refused to address the behavior and made excuses for it for many weeks. The harasser suffered no adverse employment actions due to his

discriminatory behavior and upon information and belief, continues to work at Defendant credit union.

38.     Defendants further retaliated against Plaintiff after she complained to the company regarding the discrimination against her which ultimately contributed to her termination from her employment after reporting the harassment.

39.     Plaintiff seeks legal and equitable relief regarding deprivation of certain rights as secured by Michigan Elliot Larson Civil Rights Act of 1976, as amended; specifically, MCLA 37.2103, 37.2202, and 37.2701.

40.     As a result of the foregoing, Plaintiffs lost earnings and benefits and suffered mental anguish and emotional distress for which Defendant is liable.

## G. RELIEF

WHEREFORE, Plaintiff request:

(a)     Award to Plaintiff back pay, front pay, and lost benefits with prejudgment interest;

(b)     Award to Plaintiff compensatory damages for past and future pecuniary and non-pecuniary losses resulting from the unlawful employment practices described above, including, but not limited to emotional pain, suffering, anxiety, loss of enjoyment of life, humiliation, and inconvenience, in amounts to be determined at trial;

(c)     Award to Plaintiff punitive damages for Defendants' malice or reckless indifference to Plaintiffs federally protected rights described above, in amounts to be determined at trial;

9

(d)     Award to Plaintiff liquidated (double) damages for violations of the Pump Act;

(e)     Award to Plaintiff her costs, disbursements, and reasonable attorney fees; and

(f)     Award to Plaintiff such other relief as may be just and equitable.

                                        PINSKY, SMITH PC
                                        Attorneys for Plaintiff

Dated: May 6, 2025          By  /s/ Katherine Smith Kennedy
                                        Katherine Smith Kennedy (P54881)
                                        146 Monroe Center St NW, Suite 418
                                        Grand Rapids, MI 49503
                                        (616) 451-8496

## JURY DEMAND

NOW COMES Plaintiff, by and through her attorneys, Pinsky, Smith PC and

hereby demands a trial by jury of the entitled matter.


PINSKY, SMITH PC
Attorneys for Plaintiff


Dated: May 6, 2025         By  /s/ Katherine Smith Kennedy
Katherine Smith Kennedy (P54881)
146 Monroe Center St NW, Suite 805
Grand Rapids, MI  49503
(616) 451-8496


11